IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| SEMEHAR GHEBREKIDAN ARGUELLO,<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF SIOUX CITY and ROBERT PADMORE.<br><br>DEFENDANT. | Case No.<br><br>COMPLAINT AND JURY DEMAND |

Comes now Plaintiff Semehar Ghebrekidan Arguello ("Arguello"), through her attorney, Kelsey Marquard of O'BRIEN & MARQUARD, P.L.C., and for her Complaint and Jury Demand against the City of Sioux City ("City") and Robert Padmore states:

COMMON ALLEGATIONS

1.     Arguello, also known professionally as Semehar Ghebrekidan, is a first-generation Ethiopian-Eritrean American, Greek Orthodox woman who was 26 years old in 2021.

2.     Arguello suffers from diabetes.

3.     At all times relevant to this action, Arguello resided in Sioux City, IA. Arguello currently resides in South Dakota.

4.     The City is a municipal corporation located within Woodbury County, Iowa.

5.     Arguello worked as the Community Inclusion Liaison ("CIL") and was in charge of the Unit of Community Inclusion for the City from April 12, 2021 until May 28, 2024.

6.     Arguello was the sole staff member for the Unit of Community Inclusion, part the City Manager's office. Arguello was not a standalone department, and Arguello was not a department director.

1

7. From 2014 until April 4, 2025, Robert Padmore ("Padmore") worked as the City Manager and reported to the City Council.

8. At all times relevant to this Complaint, Karen Mackey ("Mackey") worked as the Director of the City's Human Rights Commission ("HRC") and reported to the HRC.

9. At all times relevant to this Complaint, Nicole DuBois ("DuBois") worked as the City Attorney and reported to the City Council.

10. From the beginning of Arguello's employment until his appointment as Interim City Manager on or around April 7, 2025, Mike Collett ("Collett") worked as the Assistant City Manager and reported to Padmore.

11. At all times relevant to this complaint, Janelle Bertrand worked as the Director of the Human Resources department ("HR") and reported to Padmore.

12. As CIL, Arguello served as a liaison between city leadership, departments, and community stakeholders to advance equity, inclusion, and accessibility initiatives. She supported policy development, coordinated community engagement efforts, responded to constituent concerns, and provided guidance on inclusive practices across city operations. Additionally, she assisted with program implementation, data tracking, and interdepartmental communication related to civil rights, ADA accessibility, language accessibility and community inclusion priorities. She also served as the Limited English Proficiency Coordinator.

13. Arguello was also assigned the roles to manage the Inclusive Sioux City Advisory Committee ("ISCAC") and the Yamanashi City Sister City Committee.

14. When Arguello started, her salary was $4.27 higher than the lowest end of the advertised salary range which was $57,325 - $83,720.

2

15. Padmore was to perform a three-month review and a six-month review during Arguello's probationary period.

16. Padmore never performed a three-month review during Arguello's probationary period.

17. At the end of Arguello's six-month probationary period, Padmore reviewed Arguello's performance. He rated her overall performance as Exceeding Expectations.

18. During Arguello's first year of employment, she was within 1 block of a drive-by shooting, which she reported to the police at the time who offered to respond more quickly if she called the Chief directly. Padmore took no action to ensure her safety, and, instead, referenced the incident jokingly during a Department Head meeting,

19. In 2022, Padmore and another male employee were investigated because of allegations about how they treated women in the workplace. The City retained an outside attorney to conduct the investigation. During the investigation, these employees were not placed on administrative leave, were not required to work from home, and were not removed from their job duties during the pendency of the investigation.

20. On June 1, 2022, Padmore reviewed Arguello's performance and rated her overall performance as Exceeds Expectations. Arguello's only Meets Expectations rating was in the Teamwork category where Padmore still noted that Arguello was a "good member of our team."

21. In the 2022 review, Padmore noted that Arguello "provided assistance to numerous departments to strengthen hiring in our organization. Beyond that, she has assisted in the development of policies which ensure fair and equal treatment after they are hired."

3

22. In the 2022 review, Padmore noted Arguello had established a strong equity program within the community and that she could be counted on to make reasoned decisions and to develop logical solutions.

23. Arguello received a raise following the June 2022 review.

24. Throughout 2022, Arguello publicly announced and posted community inclusion events on Facebook approximately six months in advance of the events. Mackey duplicated many of these events that had been planned and coordinated by Arguello and then advertised them for only a short period before the event. Arguello reported this conduct to Padmore and City Council members, yet no corrective action was taken.

25. On November 1, 2022, Arguello reported to Padmore and a member of the HR that a male employee had made an unsolicited and inappropriate comment by telling her she was "hot" and, at the same time, touched his penis. Arguello did not welcome this behavior. The male employee was not placed on administrative leave, was not removed from his job duties, and continued working during the investigation into Arguello's complaint.

26. Arguello complained to Padmore that Mackey made multiple derogatory comments about her in public settings, including remarks concerning Arguello's age and perceived youth, her qualifications for her role, and implications regarding her religious status. Rather than addressing this conduct or taking corrective action, Padmore responded by telling Arguello that she needed to "get a thicker skin."

27. On January 11, 2023, Arguello submitted a conflict of interest waiver to the City because she had started her own business to provide DEI training and services to other entities. She did not provide any contracted services to the City. The same day, Padmore approved the waiver.

4

28. In February and March of 2023, in recognition of her outstanding contributions and the quality of her work, Arguello received two awards: the Sioux City Women Aware Women of Excellence Award in the category of Women Striving to Improve Quality of Life, and The Hero of the Heartland Award through the Iowa and Nebraska Red Cross.

29. On February 4, 2023, during a publicly live-streamed budget session to address departmental funding Council Member Matthew O'Kane publicly questioned Arguello's competency, qualifications, level of programming, and relationship with the HRC. Arguello was not informed that her performance would be addressed at this meeting and her performance was not on the agenda.

30. At the same meeting, council members also spoke about Arguello's role as though it was in competition with Mackey's role. The roles were distinct as Arguello's role involved assisting in preventative measures and programmatic support related to diversity, equity, and inclusion while the HRC engaged in formal complaint-handling functions.

31. The publicly aired conduct during the February 4, 2023 meeting contributed to ongoing challenges for Arguello to perform her duties. By publicly questioning her qualifications and competence, the meeting set a precedent that undermined her professional authority, creating an environment in which any individual—regardless of their qualifications—felt empowered to second-guess and publicly judge Arguello's work. This conduct interfered with her ability to perform her job free from unwarranted scrutiny.

32. On February 8, 2023, as part of the budget process, Mackey submitted a memo to the City Council claiming that the HRC and Arguello were unable to work together and attributing that alleged breakdown solely to Arguello. This characterization was inaccurate. Arguello was never asked to provide a memorandum or respond to these allegations.

5

33. Prior to the submission of Mackey's memorandum, the City Council had directed that the HRC and Arguello hold monthly coordination meetings. After February 8, 2023, Padmore canceled the monthly meeting and instead scheduled a meeting with Mackey, Padmore, Arguello, council member O'Kane, and council member Schoenherr. The monthly meetings City Council directed to happen never occurred. This denied Arguello the operational support and communication mechanisms intended to facilitate her role.

34. During the meeting to address these concerns, council members Schoenherr and O'Kane, Human Rights Commissioner Manualito Parker, Mackey, Arguello, and Padmore were present. During the meeting, Arguello raised formal concerns regarding Mackey's repeated comments about her age, perceived lack of experience, her religious beliefs, and other hostile and derogatory conduct. Despite the presence of City leadership, these concerns were never addressed.

35. During the same meeting, Mackey admitted she had spoken negatively about Arguello's age and experience in both public and private settings. She expressed she did not believe Arguello was qualified for the role.

36. During the same meeting, Human Rights Commissioner Parker, who had previously served on the ISCAC, threatened Arguello by stating that if Arguello did not begin working with Mackey, "bad things would happen." Schoenherr sought clarification and Parker reasserted his prior threat—that "bad things could happen" to Arguello if she does not begin to work with Mackey.

37. Parker's prior involvement with ISCAC and his threatening behavior created an environment where Arguello was concerned for her safety and the health of ISCAC. These statements and the resulting hostile environment were witnessed by Arguello's supervisor, senior

6

city leadership, and Arguello, yet no investigation occurred and no corrective action was taken. Parker continued serving on the HRC.

38.     No substantive corrective action or resolution resulted from this meeting. Following the meeting, Mackey's subsequent attempts to work with Arguello were limited to offering Arguello opportunities to staff HRC tables at public events, rather than engaging in ongoing coordination, collaboration, or programmatic partnership.

39.     On the morning of February 9, 2023, Arguello expressed concern to Padmore about the threatening statements made toward her during the meeting by Parker, as well as prior derogatory comments made by Mackey about Arguello's age and perceived religion. Padmore refused to address Arguello's concerns despite the threats that had occurred in his presence and despite his duty under City policies. Arguello advised Padmore that City policy permitted her to report such conduct directly to him, Padmore repeatedly redirected her to HR, raised his voice, and stated that he wanted Arguello to "move forward" and was unwilling to address the matter.

40.     On March 2, 2023, during a public HRC meeting, Mackey expressed negative opinions about Arguello that undermined her professional standing. An attendee at the HRC meeting reported Mackey's negative behavior to Padmore.

41.     Mackey had previously expressed similar opinions to her staff about Arguello.

42.     On March 8, 2023, Arguello requested that the monthly meeting between herself, Padmore, and Mackey be continued until after Padmore had a chance to address Mackey's behavior. This behavior was never addressed.

43.     On April 26, 2023, Mackey paid her niece to spy on Arguello at the Celebrate Diversity Carnival at Western Iowa Tech Community College. A community member and Arguello both reported this incident to Padmore. and Assistant City Attorney Amber Hegarty

7

("Hegarty"). The incident was substantiated through multiple witnesses, witness statements, text messages and confirmed during the subsequent investigation conducted by Melissa Schilling, who was hired by the City of Sioux City to investigate the matter.

44. On May 16, 2023, Arguello moved to a new office. While moving, Arguello got hot and removed her jacket. Dubois reported Arguello's jacket removal to HR, telling HR that Arguello only wore a tank top to work. Padmore requested that HR address the matter with Arguello.

45. Since starting her employment with the City of Sioux City, Arguello had used a sound machine for private meetings in her office. On May 22, 2023, Padmore informed Arguello she could no longer have the sound machine by her office.

46. On May 25, 2023, Arguello met with HR about a complaint that had been lodged against her. During this meeting, Arguello learned that Dubois was the individual who had reported her for removing her jacket while she moved offices.

47. On June 15, 2023, the City completed the investigation into the complaint about Arguello which concluded Arguello did nothing wrong.

48. From April 2023 through October 2023, the City investigated Mackey's behavior and hired an outside attorney to conduct the investigation. Mackey remained in her role without being placed on leave, having her job duties restricted, or being assigned to home confinement.

49. During the investigation into Mackey in June 2023, council member O'Kane told an ISCAC member that they both needed to support Mackey during the investigation because they were both Native American. The ISCAC member reported the behavior to the City's Legal Department. The City took no action to address the council member's behavior.

8

50. Arguello requested the council member recuse himself from any vote regarding the investigation into Mackey. This did not occur.

51. Throughout the course of the Mackey investigation, Mackey failed to follow established procedures for working with Arguello, had her staff submit complaints against Arguello, and continued to make public statements disparaging Arguello.

52. During the Mackey investigation, Mackey attended the Sounds of West 7th Festival and told a fellow school board candidate that Arguello had "made her life a living hell" and that "if Arguello and Hitler were on the ballot, she would rather vote for Hitler."

53. The outside attorney completed her investigation and submitted her findings on October 2, 2023. The report concluded that Mackey had displayed hostility toward Arguello, spoke negatively about Arguello in public settings, paid her niece to spy on Arguello, and failed to engage in meaningful efforts to collaborate with Arguello.

54. Despite the outside attorney's findings, Mackey was not fired, disciplined, or otherwise held accountable by either the City Council or the HRC.

55. Many HRC commissioners have personal or conflicted relationships with Mackey—such as serving on each other's boards or maintaining personal friendships.

56. During the Mackey investigation, Mackey publicly posted on Facebook about Arguello wearing a cross. Three community members reported Mackey's post to the City, who referred the complaints to the HRC. The HRC did not take any action on the complaints.

57. On June 11, 2023, Padmore performed Arguello's annual performance evaluation. He rated her overall performance as Exceeds Expectations. In the areas of Innovation/Continuous Improvement, Respecting Differences, and individualized Goals, Padmore rated Arguello's performance as Outstanding.

9

58. In some of his written comments in the 2023 review, Padmore described Arguello as "a valuable member of our organization and community."

59. Padmore recommended Arguello receive a raise after the 2023 performance evaluation.

60. On August 15, 2023, Padmore brought Arguello to the HR to discuss her apparel. Padmore, Dubois, and Bertrand examined Arguello's dress length. The then-current City dress code policy included no skirt/dress length requirement. HR concluded that Arguello was not violating the City's dress code.

61. During September 2023, Arguello was on her honeymoon, out of the country for two weeks, and had no coverage for her work duties.

62. Arguello had difficulties catching up on her work when she returned from her honeymoon.

63. On November 28, 2023, Arguello told Padmore that she was pregnant and had a high-risk pregnancy which meant additional medical appointments. For example, Arguello needed to attend blood draws during her lunch breaks to manage her health, given her diabetes outside of pregnancy.

64. Arguello also asked Padmore about maternity leave. Arguello told Padmore she expected to take three months of maternity leave and asked if her intern could provide coverage. Padmore agreed that the Unit's intern could provide coverage during Arguello's leave.

65. Padmore asked Arguello if she was happy about her pregnancy. When she confirmed that she was, he stated, "Now you'll have another loudmouth in the house."

66. On December 18, 2023, Arguello submitted an annual report to the City Council providing an overview of all the work she completed, including programming, fundraising

10

efforts, attendance, and social media engagement because Padmore had failed to provide these updates to City Council. Padmore had not discussed the Unit of Community Inclusion's budget with Arguello during the budget process even though the Unit was under his direction.

67. In the 2023 Annual Report to City Council for the Unit of Community Inclusion, Arguello requested a pay increase for her position because the range for the City's CIL was the lowest in the state.

68. In the 2023 Annual Report, Arguello requested the Unit of Community Inclusion budget be increased from $0 to $5,000 because the Unit was also responsible for managing two committees, ISCAC and Yamanashi City, which had no independent funding. Without City funding, Arguello was forced to fundraise to complete her job duties. Other City departments were not forced to fund their missions without help from the City.

69. Padmore chastised Arguello for sending her 2023 Annual Report directly to City Council. He specifically noted that her requests to increase her pay and the Unit of Community Inclusion budget were inappropriate.

70. In December 2023, another City employee allowed a woman to come to Arguello's office on the second floor of City Hall. Arguello's office had limited security, no cameras, and no silent alarm. The woman remained in Arguello's office for nearly two hours, effectively trapping her there. The woman repeatedly demanded Arguello call a specific FBI agent, and she asked for transportation assistance.

71. The woman refused to provide any identifying information or allow Arguello to involve local law enforcement. The woman kept making statements about her husband's alleged domestic terrorism activities, kidnapping claims, and other potential threats.

11

72. After this incident, Arguello requested the City provide a silent alarm or other safety measures. The City took no action to provide security measures.

73. Arguello purchased a camera for her office to provide some semblance of safety measures.

74. After the woman left Agruello's office, Arguello immediately contacted the City's police chief, who told her to document the incident.

75. On December 12, 2023, Arguello told Padmore she believed she was underpaid. This was her fourth complaint about her pay. Padmore stated her pay was enough. He did not address her complaint further.

76. On January 4, 2024, Arguello emailed Padmore because HR told her to punch out for her lunch when she needed to attend medical appointments. This was contrary to Padmore's instructions when Arguello originally told him about her pregnancy and expected medical appointments. This was also contrary to Padmore's directive when Arguello needed to attend medical appointments over lunch before she was pregnant.

77. City policy does not generally require employees to punch out for lunch.

78. Arguello expressed concern she was being treated differently because of her pregnancy by being required to punch out for lunch breaks.

79. Unlike other employees, Arguello was required to disclose personal activities, including medical appointments, that she conducted during her lunch breaks.

80. On January 16, 2024, Arguello received a note for a Handicapped Parking Permit from her doctor.

81. On January 18, 2024, Arguello requested an accommodation for a parking space within one block of her work due to complications from her pregnancy.

12

82.     On January 25, 2024, after discussions with Bertrand and Padmore, the City accommodated Arguello's request by allowing her to park in an unassigned spot in the library parking lot. The City originally told Arguello she needed to pay for more expensive parking to be accommodated. Arguello expressed concern that the City was not providing a reasonable accommodation under the Pregnant Workers Fairness Act because it owned the majority of the downtown parking spaces and it could accommodate her without her incurring additional out-of-pocket expenses.

83.     On January 25th, 2024, Bertrand and Padmore came to Arguello's office and expressed frustration with Arguello discussing the accommodations process with another employee.

84.     On January 26th, 2024, Arguello emailed Bertrand to document her that conversation and her concerns about the City's accusations she interfered with the City's accommodation process. Arguello expressed concern that HR's reaction violated civil rights laws' prohibitions against coercion, threats, or interference. Arguello noted that part of her role was to advise City departments on diversity, equity, and inclusion matters.

85.     On January 27, 2024, Arguello submitted a complaint to the Equal Employment Opportunity Commission ("EEOC") regarding the City's handling of accommodations under the PWFA. She ultimately withdrew the complaint.

86.     Around this time, Arguello confided in the Vice Chair of the ISCAC about Padmore creating issues for her at work. She didn't know how to proceed. The Vice Chair contacted city council member Schoenherr to report these concerns. The City did not take any action to address Arguello's complaint.

87. Arguello did not feel comfortable reporting concerns about how Padmore treated her to HR because Padmore supervised HR.

88. In early February 2024, Arguello spoke with several members of the public who were considering filing a discrimination complaint. Arguello provided guidance on creating timelines and documenting incidents, drawing on her prior experience assisting others with similar documentation throughout her time at the City.

89. Arguello had previously helped others who were contemplating filing a discrimination complaint. In her one-on-ones with Padmore she had reported she occasionally provided this assistance to members of the public. Padmore did not express any concern that Arguello provided this assistance.

90. On February 13, 2024, Arguello filed a discrimination complaint with the EEOC. The complaint raised allegations of discrimination and retaliation by the City based on her age, religion, pregnancy, and prior complaints regarding hostile work environment, unsafe working conditions, and misconduct by City officials and employees.

91. On February 14, 2024, Arguello forwarded a complaint from a resident concerning the Human Rights Commission to Padmore and DuBois.

92. On February 15, 2024, Arguello submitted a complaint to the Government Accountability Office (GAO) regarding potential mismanagement and fraud by the City involving the Housing Choice Voucher Program. Arguello reported that the City attempted to redirect funds that the redirection could bankrupt the program and leave approximately 700 low-income families in Sioux City without housing. She also reported employees misappropriated cash or time, and a nonprofit failed to use funds as intended. The City took no action to hold either the employees or the nonprofit accountable.

93. On February 17, 2024, City Council held its annual, live-streamed budget meeting. Arguello attended as a member of the public. For the second year in a row, her qualifications, credentials, and programming efforts were publicly questioned. Arguello's performance was not an agenda item, and Arguello had not been given the opportunity to request her performance be discussed in a closed session.

94. During the budget meeting, Padmore stated over the microphone that Arguello was a "poor consultant" regarding diversity, equity, and inclusion (DEI) and was not fulfilling her duties. Arguello followed state executive orders that prohibited her from conducting mandatory in-house training. At Padmore's direction, Arguello prioritized outreach efforts and minimized in-house programming.

95. During the budget meeting, the Council questioned Arguello about updating the EEOC plan. Arguello had been working for months to update the plan. Padmore had told Arguello the Council was resistant to updating the plan but told the Council that Arguello was the resistant one because she did a poor job of DEI consulting.

96. Padmore's representation that Arguello did a poor job of DEI consulting affected Arguello's professional reputation and ability to get clients.

97. Given City Manager Padmore's position as a visible public official and her direct supervisor, negative statements he made regarding Arguello's competence or professionalism were likely to be taken as authoritative and to harm her professional reputation, credibility, and future employment prospects.

98. During the budget meeting, Arguello told the Council its treatment of the Unit of Community Inclusion was markedly harsher than that of other departments.

99. On February 20, 2024, Arguello submitted a written complaint to the City Council regarding the conduct of Bertrand, Mackey, Dubois, and Padmore. In her complaint, she detailed multiple instances of racial inequality and systemic barriers within the City's organization and observed the City's unwillingness to address these issues.

100. In her February 20th complaint, Arguello highlighted that she had adhered to council directives regarding internal and community work allocation, completed extensive outreach efforts, and worked to update outdated policies, including the EEOC plan, despite resistance and misrepresentation by Padmore. She emphasized her efforts to recruit diverse candidates and noted repeated obstacles due to systemic biases and legal limitations on mandatory internal training.

101. In her February 20th complaint, Arguello discussed the lack of support, recognition, and constructive dialogue within the City, particularly in addressing issues of racial inequity. She outlined the ethical and legal implications of misrepresenting the City's commitment to diversity and inclusion, including the potential for reputational and legal harm. Arguello requested the Council investigate the conduct of the individuals named in her complaint and take meaningful action to ensure that organizational practices reflect genuine equity and inclusivity.

102. On February 21, 2024, the City placed Arguello on administrative leave. Collett and Assistant City Attorney Hagerty authored the memo that placed Arguello on leave. The memo alleged that Arguello violated work rules, but it did not identify any specific police, rule, law, or standard that Arguello allegedly violated.

103. Without knowledge of the specific reasons why the City suspended her, Arguello could not prepare a response to the City's allegations.

16

104. Padmore initiated Arguello's suspension but refused to author or sign the suspension letter.

105. Multiple City Council members forwarded complaints regarding Arguello directly to Padmore without conducting any independent investigation, contrary to the Council's oversight responsibilities and established complaint-handling procedures.

106. During the administrative leave, the City told Arguello she could not leave her home from 8:00 a.m. to 4:30 p.m., Monday through Friday, unless she obtained prior authorization from her supervisor. Requiring Arguello to use leave to leave her house, including for lunch-time medical appointments, would deplete the leave Arguello had accumulated to use for her upcoming maternity leave.

107. The City stripped Arguello her work duties, access to her work equipment, and prohibited her from representing the City.

108. Unlike Arguello, other employees placed on administrative leave were not placed on leave or put on house arrest during work hours.

109. On the same day Arguello was placed on administrative leave, the City terminated the Unit's intern.

110. Throughout its investigation, the City held meetings with citizens and members of ISCAC to attempt to garner support to terminate Arguello.

111. Information from the investigation leaked and was publicly posted on Facebook. Despite notification to the City about the leak, behaviors that led to the leak continued.

112. Members of the public attended a City Council meeting and asked about Arguello's sudden absence. Mayor Bob Scott responded by announcing Arguello had retained legal counsel regarding her suspension.

17

113. On March 19, 2024, the City sent Arguello a notice that it had become aware of her request to use leave under the Family and Medical Leave Act. This action was not authorized by Arguello.

114. In April 2024, Arguello received national recognition for her work, being awarded the "Remarkable Women Award" in Hollywood.

115. For approximately nine weeks after the City placed her on leave, Arguello had little knowledge of the specific allegations made against her.

116. Arguello assumed the investigative interview would be conducted by an outside attorney as had been done in other investigations.

117. Padmore and DuBois conducted the investigative interview.

118. Padmore and DuBois were the subject of complaints by Arguello and had not been investigated by City Council or an outside investigator.

119. The investigative interview lasted approximately four hours with the bulk of the questioning conducted by Padmore and Dubois.

120. Padmore and Dubois authored the investigative summary that was used to justify Arguello's termination and to support the City's denial of her unemployment benefits.

121. Based on the widespread rumors and misinformation being circulated throughout the community, Arguello was concerned that her professional and personal reputation was being damaged. In response, she issued a personal statement to address the events and circumstances she experienced during her tenure at the City of Sioux City.

122. After the investigative interview, the City told Arguello that they intended to hold a pre-termination hearing. Arguello requested accommodations to participate remotely rather than in person. Her physician provided a note that in-person attendance could potentially

18

endanger her pregnancy. The City then attempted to place her on FMLA leave instead of providing the requested accommodation. Arguello objected, and the City provided her with the accommodation.

123. Arguello requested that a pre-termination hearing be conducted by a neutral, third-party individual not affiliated with the City.

124. The City assigned Collett to conduct the hearing. Collett conducted the hearing via email. Collett sent Arguello the investigative summary and asked her to respond to the charges. Arguello had already provided the relevant information.

125. Collette followed his supervisor's suggestion and recommended termination. He forwarded that recommendation to Padmore.

126. The City of Sioux City, through Padmore and DuBois, issued an Investigative Summary on May 22, 2024. The Summary outlined alleged violations of City policies, administrative work rules, and Iowa law, including claims that Arguello exceeded her authority by assisting individuals with filing out-of-state civil rights complaints, misrepresented herself as acting on behalf of the City, and failed to obtain supervisory approval for certain professional actions. The Summary also alleged that Arguello maintained a private business that referenced her City employment and that she shared confidential information and recordings obtained through her City role. The investigation and related interviews spanned from February through April 2024, during which Arguello was placed on administrative leave and had limited ability to respond to these allegations in real time.

127. The Summary further reported alleged violations related to professional conduct, including misrepresentation, outside employment conflicts, and the presence of a recording

device in her office. Based on this Investigative Summary, the City, through Padmore and DuBois, recommended discipline up to and including termination.

128. Arguello was on suspension for 13 weeks and 5 days.

129. On May 28, 2024, Collett, serving as the pre-disciplinary hearing officer, reviewed the investigative summary prepared by Padmore and DuBois and Arguello's written responses. Collett sided with his supervisor and recommended Arguello's termination.

130. On May 28, 2024, Padmore terminated Arguello. Padmore relied on Collett's recommendation to terminate which was based on Padmore and DuBois's recommendation to terminate.

131. During the process of vacating Arguello's office, Padmore packed her belongings. In doing so, he broke one of her awards and multiple other personal items.

132. Arguello experienced extreme stress while employed by the City and while on administrative leave which contributed to the premature birth of her son.

133. Arguello applied for unemployment benefits following her termination. During the hearings, Collett, the supposed impartial decision maker, testified on behalf of the City.

134. On September 23, 2025, the EEOC issued the Right-to-Sue letter.

135. Arguello received the Right-to-Sue letter on September 25, 2025.

136. Arguello exhausted the administrative requirements for this action.

137. Arguello suffered damages as a result of the City's actions.

COUNT I—PREGNANCY DISCRIMINATION

138. Arguello repeats and realleges the Common Allegations as if fully stated herein.

20

139.    In 2024, Arguello disclosed her pregnancy and requested reasonable accommodations, including flexibility to attend medical appointments and a nearby parking space.

140.    The City resisted giving Arguello those accommodations and treated Arguello differently than non-pregnant employees.

141.    Arguello's pregnancy and decision to request accommodations due to her pregnancy were factors in the City's decision to place Arguello on administrative leave and ultimately terminate her employment.

142.    The City's actions violated the Pregnant Workers Fairness Act, 42 U.S.C. Chapter 21G.

143.    As a result of the City's actions, Arguello suffered damages.

COUNT II—DISABILITY DISCRIMINATION

144. Arguello repeats and realleges the Common Allegations as if fully stated herein.

145.    Arguello suffered from diabetes, a disability.

146.    As a result of her disability, Arguello needed additional monitoring during her pregnancy.

147.    Arguello requested accommodations to monitor her disability during her pregnancy.

148.    The City initially resisted Arguello's attempt to obtain accommodations, but eventually acquiesced.

149.    The City's decision to place Arguello on administrative leave and, eventually, terminate her employment was based, in part, on her request for accommodations for her disability.

21

150. The City's actions violate The Americans with Disabilities Act and The Americans with Disabilities Act Amendments Act of 2008.

151. Arguello suffered damages as a result of the City's actions.

## COUNT III—RACE DISCRIMINATION

152. Arguello repeats and realleges the Common Allegations as if fully stated herein.

153. As a woman of Ethiopian-Eritrean descent, Arguello is also a Black woman.

154. During her employment, Arguello, was treated less favorably than similarly situated employees based on her race.

155. Supervisors and co-workers made repeated negative comments about Arguello, misrepresented her work, and excluded her from meetings and opportunities.

156. The City publicly questioned her competence and misrepresented her professional contributions. It did not similarly undermine white employees.

157. Non-black employees were not subjected to similar treatment.

158. The City treated Arguello differently because of her race.

159. Arguello's race played a part in the City's decision to place Arguello on leave, and, ultimately, terminate her employment.

160. The City's actions violate Title VII of the Civil Rights Act of 1964.

161. Arguello suffered damages as a result of the City's actions.

## COUNT IV—SEX DISCRIMINATION

162. Arguello repeats and realleges the Common Allegations as if fully stated herein.

163. The City treated Arguello differently because of her sex.

164. Arguello was subjected to repeated derogatory comments from colleagues and supervisors, including being told to "develop thicker skin" in response to hostile and sexist

22

remarks. City representatives publicly questioned Arguello's competence, qualifications, and professional contributions in ways they did not question male employees' competence, qualifications, and professional contributions.

165. Arguello's sex was a motivating factor in the City's decision to place Arguello on administrative leave, impose restrictive conditions that barred her from performing her work duties during her pregnancy, and, ultimately, terminate her employment.

166. The City's actions violate Title VII of the Civil Rights Act of 1964.

167. Arguello suffered damages as a result of the City's actions.

COUNT V—RETALIATION

168. Arguello repeats and realleges that Common Allegations as if fully stated herein.

169. Arguello requested reasonable accommodations for her pregnancy, complained about being treated differently because of her pregnancy and disability, complained about discriminatory treatment based on race and sex, reported her supervisor's misconduct, and reported the City's mistreatment of minority employees. Arguello also filed two complaints with the EEOC.

170. The City's actions violate Title VII of the Civil Rights Act of 1964.

171. After Arguello engaged in these protected activities, the City retaliated against her by placing her on administrative leave, restricting her from leaving her home, restricting her from performing her work duties, subjecting her to a biased investigation, publicly misrepresenting her competence, denying her participation in meetings and decision-making related to her role, and terminating her employment.

172. Arguello suffered damages as a result of the City's actions.

COUNT VI-HOSTILE WORK ENVIRONMENT/HARASSMENT

23

173. Arguello repeats and realleges that Common Allegations as if fully stated herein.

174. During her employment with the City, Arguello was subjected to a hostile work environment based on her race, sex, and pregnancy.

175. She experienced repeated derogatory comments from colleagues and supervisors, exclusion from meetings and opportunities, threats from City volunteers, and public questioning of her competence and professional contributions.

176. The City's actions created a workplace that was intimidating, offensive, and abusive.

177. The City's actions interfered with Arguello's ability to perform her job.

178. The City's actions violate Title VII of the Civil Rights Act of 1964.

179. As a result of the City's actions, Arguello suffered damages.

COUNT VII—RETALIATORY DISCHARGE IN VIOLATION OF PUBLIC POLICY

180. Arguello repeats and realleges the Common Allegations as if fully set forth herein.

181. Arguello filed a complaint with the Government Accountability Office (GAO) and raised concerns about the City's potential misuse of federal funds—a violation of Federal law.

182. The GAO is an independent, nonpartisan government agency that provides auditing, evaluative, and investigative services for Congress.

183. The City placed Arguello on administrative leave because she filed a complaint with the GAO. The City eventually terminated Arguello.

184. As a result of the City's actions, Arguello suffered damages.

WHEREFORE, Arguello respectfully requests this Court enter a judgment in her favor and against the City and Padmore for all damages allowable under law, including, but not limited to economic damages, lost pay and benefits, mental anguish, damage to her career and reputation, future lost earnings, other compensatory damages, attorney's fees, costs, interest, and punitive damages. Arguello requests all equitable relief that would be just, including reinstatement and a public retraction of statements that have harmed her reputation and career.

JURY DEMAND

Plaintiff requests a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Kelsey A.W. Marquard*
Kelsey A.W. Marquard AT0011433
O'BRIEN & MARQUARD, P.L.C.
2322 East Kimberly Road, Suite 140S
Davenport, IA 52807
563-355-6060  Telephone
563-355-6666  Facsimile
kawm@emprights.com Email
ATTORNEYS FOR PLAINTIFF

25