**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| SEMEHAR GHEBREKIDAN ARGUELLO,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SIOUX CITY, et al.,<br><br>Defendants. | No. C25-4078-LTS<br><br>**MEMORANDUM OPINION AND ORDER** |

## *I. INTRODUCTION*

This matter is before me on a motion (Doc. 13) to dismiss filed by defendants the City of Sioux City (the City) and Robert Padmore. Plaintiff Semehar Arguello has resisted (Doc. 18) and the defendants have replied (Doc. 20). Oral argument is not necessary. *See* LR 7(c).

## *II. BACKGROUND AND PROCEDURAL HISTORY*

This case arises from Arguello's employment with, and ultimate discharge by, the City. Arguello filed her initial complaint (Doc. 1) on December 22, 2025. The defendants responded by filing a motion (Doc. 6) to dismiss under Federal Rule of Civil Procedure 12(b)(6). Doc. 6. Arguello sought leave to file an amended complaint, adding additional counts. Doc. 7; Doc. 7-2 at 26-31. The court granted this request and Arguello filed her amended complaint (Doc. 9) on April 16, 2026. The defendants have now filed a motion (Doc. 13) to dismiss the amended complaint under Rule 12(b)(6).

Arguello asserts the following claims:

- Count I – Pregnancy Discrimination under the Pregnant Workers Fairness Act (PWFA) against the City

- Count II – Disability Discrimination under the Americans with Disabilities Act (ADA) and Americans with Disabilities Act, As Amended (ADAAA) against the City

- Count III – Race Discrimination under Title VII of the Civil Rights Act of 1964 against the City

- Count IV – Sex Discrimination under Title VII against the City

- Count V – Retaliation under Title VII against the City

- Count VI – Hostile Work Environment Based on Race, Sex and Pregnancy under Title VII against the City

- Count VII – Wrongful Termination in Violation of Iowa Code § 70A.29 against the City

- Count VIII – Race Discrimination in Violation of 42 U.S.C. § 1981 via 42 U.S.C. § 1983 against the City

- Count IX – Race Discrimination in Violation of 42 U.S.C. § 1981 against Padmore in his individual capacity[1]

- Count X – Procedural Due Process Claim via 42 U.S.C. § 1983 against the City and Padmore in his individual capacity

- Count XI – Defamation against the City and Padmore in his individual capacity

- Count XII – Interference with Business Relations against Padmore in his individual capacity

Doc. 8 at 21–29. The defendants seek dismissal of all claims but Counts V and VII. Doc. 13 at 3–4. Arguello agrees to dismiss the race-based portion of her hostile work environment claim (Count VI), along with Count X in its entirety. Doc. 18 at 1–2.

[1] Arguello failed to bring this claim pursuant to 42 U.S.C. § 1983 and requests to amend this pleading error. Doc. 18-1 at 10.

At this stage of the case, I must accept as true all factual allegations set forth in the amended complaint. With that standard in mind, the relevant facts are as follows:

Arguello is a first-generation Ethiopian-Eritrean American woman, who also identifies as Black. Doc. 9 ¶¶ 1, 160. From April 12, 2021, until May 28, 2024, Arguello worked as the Community Inclusion Liaison for the City and led the Unit of Community Inclusion, beginning this position when she was 26. *Id.* ¶¶ 1, 5. The Unit was included within the City Manager's office. *Id.* ¶ 6. Although she was the Unit's only member, she was not a standalone department or department director. *Id.*

While Arguello worked for the City, Padmore was the City Manager. *Id.* ¶ 7. During this time, Karen Mackey was the Director of the City's Human Rights Commission (HRC) and reported to the HRC, Nicole DuBois was the City Attorney, Mike Collett was the Assistant City Manager and Janelle Bertrand was the Director of the Human Resources Department (HR). *Id.* ¶¶ 8–11. Padmore and DuBois reported to the City Council, while Arguello, Collett and Bertrand reported to Padmore. *Id.* ¶¶ 7–11, 15.

Arguello's employment with the City began successfully and she received both positive performance evaluations from Padmore and external awards recognizing her work. *See, e.g.*, *id.* ¶¶ 20, 28. She also developed her own private consulting business, with Padmore's approval. *Id.* ¶ 217. However, in 2022 Arguello reported that a male coworker told her that she was "hot" while touching his penis. *Id.* ¶ 25. The City investigated her complaint but did not place the male employee on administrative leave and he remained in his job duties. *Id.*

Arguello also began to have conflicts with Mackey and others in the City government. In 2022, Mackey made several negative public comments about Arguello's age, experience and religious beliefs. *Id.* ¶ 26. On February 4, 2023, during a publicly live-streamed budget session, a city councilmember "publicly questioned Arguello's competency, qualifications, level of programming, and relationship with the HRC." *Id.*

¶ 29. Arguello believed that these remarks undermined her authority, making her job more difficult. *Id.* ¶ 31.

Mackey continued speaking negatively about Arguello's age and experience. *Id.* ¶ 35. On April 26, 2023, Mackey paid her niece to spy on Arguello while Arguello worked at an outreach event. *Id.* ¶ 43. The City had an outside attorney investigate Mackey's behavior. *Id.* ¶ 48. While the investigation proceeded, "Mackey remained in her role without being placed on leave, having her job duties restricted, or being assigned to home confinement." *Id.* Similarly, in 2022, the City had an outside attorney investigate Padmore and another male employee regarding allegations about how they treated women in the workplace. *Id.* ¶ 19. The men "were not placed on administrative leave, were not required to work from home, and were not removed from their job duties during the pendency of the investigation." *Id.*

While Mackey's investigation proceeded, a councilmember told a committee member that they "needed to support Mackey . . . because they were both Native American." *Id.* ¶ 49. The committee member reported this statement to the City's legal department, which did not address it. *Id.* Arguello asked the councilmember to recuse from any vote regarding Mackey's investigation, but the councilmember refused. *Id.* ¶ 50. Mackey continued making public statements disparaging Arguello during the investigation and instructed her staff to submit complaints about Arguello. *Id.* ¶ 51. The outside attorney's investigation concluded that "Mackey had displayed hostility toward Arguello, spoke negatively about Arguello in public settings, paid her niece to spy on Arguello, and failed to engage in meaningful efforts to collaborate with Arguello." *Id.* ¶ 53. Mackey was not fired or disciplined because of the investigation. *Id.* ¶ 54.

In 2023, Arguello received complaints about her work attire. In May, Arguello removed her jacket while moving offices. *Id.* ¶ 44. DuBois told HR that Arguello had worn only a tank top to work. *Id.* The City investigated the complaint, concluding Arguello had done nothing wrong. *Id.* ¶ 47. In August 2023, Padmore questioned the length of Arguello's dress and brought her to HR. *Id.* ¶ 60. Although the dress code

did not address dress length, Padmore, Dubois and Bertrand examined her dress. *Id.* Ultimately, HR determined that she had not violated the City's dress code. *Id.*

In September 2023, Arguello took a two-week honeymoon. *Id.* ¶ 61. No one covered her work while she was away and she struggled to catch up once she returned. *Id.* ¶¶ 61–62. On November 28, 2023, Arguello told Padmore that she was pregnant and had a high-risk pregnancy, requiring her to attend additional medical appointments. *Id.* ¶ 63. Because Arguello has diabetes, she would need to have her blood drawn over her lunch breaks. *Id.* Arguello and Padmore discussed her maternity leave. *Id.* ¶ 64. She told him that she wanted to take three months of maternity leave and asked that her intern provide coverage while she was out. *Id.* While discussing her pregnancy, Padmore stated: "Now you'll have another loudmouth in the house." *Id.* ¶ 65.

In December 2023, Arguello submitted a report to the City Council overviewing her work and requesting a budget increase and pay raise. *Id.* ¶¶ 66–68. Padmore was unhappy that Arguello sent the report directly to City Council, specifically noting that her requested increases were inappropriate. *Id.* ¶ 69. On December 12, 2023, for the fourth time, Arguello told Padmore that she was underpaid. *Id.* ¶ 75. Padmore told her that she was paid enough. *Id.*

In January 2024, HR told Arguello to clock out over lunch when attending medical appointments. *Id.* ¶ 76. Before Arguello was pregnant, Padmore did not have her clock out when she attended medical appointments over lunch and when they discussed her pregnancy and additional appointments, he told her she could remain clocked in. *Id.* Because the City did not ordinarily require employees to clock out for lunch, Arguello expressed concern that she was being treated differently because she was pregnant. *Id.* ¶¶ 77–78. This policy made Arguello "disclose personal activities, including medical appointments, that she conducted during her lunch breaks." *Id.* ¶ 79.

Arguello's doctor wrote her a note for a handicapped parking permit and she asked that the City accommodate her pregnancy complications by providing her with a parking space within one block of her work. *Id.* ¶¶ 80–81. At first, the City told her that she

would need to pay for more expensive parking to be accommodated. *Id.* ¶ 82. But she advocated for herself and she received an accommodated spot without this additional charge a week after she submitted her request.[2] *See id.* ¶ 82. That day, Bertrand and Padmore expressed frustration with her that she had discussed her accommodations process with another employee. *Id.* ¶ 83. The next day, Arguello emailed Bertrand to document their conversation and explain that she was concerned the City had accused her of interfering with its accommodations process. *Id.* ¶ 84. Arguello submitted, but later withdrew, a complaint to the Equal Employment Opportunity Commission (EEOC) about the City's accommodations process under the PWFA. *Id.* ¶ 85.

On February 17, 2024, the City Council held its live-streamed annual budget meeting. *Id.* ¶ 95. Individuals attending the meeting publicly questioned Arguello's qualifications, credentials and programming. *Id.* Padmore stated that she "was a 'poor consultant' regarding diversity, equity, and inclusion (DEI) and was not fulfilling her duties." *Id.* ¶ 96. The Council questioned her about updating the EEOC plan, which she had been working on for five months. *Id.* ¶ 97. Although Padmore had told her that the Council did not want to update the plan, he "told the Council that Arguello was the resistant one because she did a poor job of DEI consulting." *Id.* Padmore's statements affected her professional reputation and ability to get clients for her consulting business. *Id.* ¶ 98.

On February 20, 2024, Arguello submitted a complaint to the City Council about the conduct of Mackey, Bertrand, DuBois and Padmore. *Id.* ¶ 101. She also complained about racial inequality and systematic barriers in the City's organization. *Id.* The next day, the City placed her on administrative leave. *Id.* ¶ 104. The memorandum placing her on leave alleged that she had violated work rules without identifying the specific policy, rule or standard that she had violated. *Id.* While on administrative leave,

[2]Arguello acknowledges that she was granted this accommodation without additional expense. Doc. 18-1 at 6.

Arguello could not leave her home during work hours without prior approval from her supervisor, perform her job duties, access her work equipment or represent the City. *Id.* ¶¶ 108–09. Requiring her to request time off to leave her home, including to attend medical appointments, risked depleting the leave that she planned to use for her maternity leave. *Id.* ¶ 108. The City did not require other employees placed on administrative leave to remain in their homes during work hours.[3] *Id.* ¶ 110.

While outside attorneys ordinarily conducted investigations, Padmore and Dubois – who had been the subject of her complaints – conducted Arguello's investigative interview. *Id.* ¶ 118–20. The City held a pretermination hearing after the investigative interview. *Id.* ¶ 124. The City wanted to conduct the hearing in person but Arguello requested accommodations to have a remote hearing, presenting a note from her doctor stating that an in-person meeting could endanger her pregnancy. *Id.* The City eventually accommodated her request and held the hearing via email. *Id.* ¶¶ 124, 126. Collett held the hearing and recommended that the City terminate her employment. *Id.* ¶ 127.

On May 22, 2024, the City, through Padmore and DuBois, issued an investigative summary. *Id.* ¶ 128. This summary alleged that Arguello had violated Iowa law, City policies and administrative work rules. *Id.* The City contended that Arguello had exceeded her authority by helping individuals file out-of-state civil rights complaints, failing to obtain supervisory approval for professional actions and inaccurately representing herself as acting on the City's behalf. *Id.* Padmore terminated Arguello's employment on May 28, 2024. *Id.* ¶ 133. The EEOC issued Arguello a right-to-sue letter on September 23, 2025. *Id.* ¶ 138.

[3] Confusingly, Arguello claims that "other employees placed on administrative leave were not placed on leave." *Id.* ¶ 110.

## *III. APPLICABLE STANDARDS*

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While factual

plausibility is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable legal theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins. Co.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when the pleadings necessarily embrace certain documents, I may consider those documents without turning a motion to dismiss into a motion for summary judgment. *McMahon*, 2018 WL 3381406 at *2 n.2. These documents include "exhibits attached to the complaint." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment

> suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.,* 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## *IV. DISCUSSION*

The defendants seek dismissal of all claims but Counts V and VII. Doc. 13 at 3-4. First, they contend that the amended complaint fails to state a plausible claim of discrimination on any basis, affecting Counts I, II, III, IV, VIII and IX, before addressing individual claims. Doc. 20 at 2. Next, regarding Count VI, they claim that Arguello has failed to state a plausible hostile work environment claim. Doc. 13 at 2. Finally, they argue that Counts XI and XII must be dismissed because Arguello filed those claims after the statute of limitations expired and has failed to state a claim for either defamation or tortious interference. *Id.* at 3.

### *A. Counts I, II, III, IV, VIII and IX - Discrimination Claims*

The defendants contend that Arguello's "discrimination claims fail because the Amended Complaint does not plausibly allege any adverse employment action occurred because of [her] pregnancy, race, disability, or sex." Doc. 13-1 at 5. "At the pleading stage in the discrimination context, it is unnecessary to plead enough facts to establish a prima facie case." *Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024). "Nevertheless, the elements of a prima facie case remain relevant in determining the plausibility standard as the elements 'may be used as a prism to shed light upon the plausibility of the claim.'" *Id.* (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)).

### *1. Counts I and II - Pregnancy and Disability Discrimination Claims*

The parties analyze both Counts I and II as containing three separate claims: discrimination, failure to accommodate and interference. Because many claims under the PWFA utilize the standards established by the ADA, I will discuss the ADA claims first.

#### *a. Count II – ADA Discrimination Claims*

##### *i. Disparate Treatment Claim*

The ADAAA prohibits employers from discriminating against individuals on the basis of disability. 42 U.S.C. § 12112(a). A plaintiff can demonstrate discrimination through direct evidence or by raising an inference of discrimination through the *McDonnell Douglas*[4] burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). A prima facie case of disability discrimination requires the plaintiff to show she: (1) had a disability within the meaning of the relevant statute, (2) was qualified to perform the essential functions of her job with or without reasonable accommodation and (3) suffered an adverse employment action because of her disability. *Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (citing *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996–97 (8th Cir. 2014)).

At this time, the parties do not dispute the first two elements, instead contesting whether Arguello suffered an adverse employment action because of her disability. Arguello alleges that "[t]he City's decision to place Arguello on administrative leave and, eventually terminate her employment was based, in part, on her request for accommodations for her disability." *Id.* ¶ 156. Other than this general allegation, she alleges no facts supporting her claim that her disability led to an adverse employment action. Without supporting facts, she has failed to state a plausible claim that her

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

disability led to either her placement on administrative leave or termination. Therefore, this claim is dismissed.

### *ii. Failure to Accommodate Claim*

The defendants argue that Arguello's failure to accommodate claim fails because they accommodated her requests and she must "show she suffered an adverse employment action because of the disability." Doc. 13-1 at 8–9 (citing *Ehlers v. Univ. of Minnesota*, 34 F.4th 655, 659 (8th Cir. 2022). However, an employer commits "an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016).

Failure to accommodate claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. *Peeble v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). Instead, "a modified burden-shifting analysis" is applied. *Id.* (citing *Fenney v. Dakota, Minnesota & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)). "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive." *Id.* Rather, the alleged discrimination "is framed in terms of the failure to fulfill an affirmative duty - the failure to reasonably accommodate the disabled individual's limitations." *Id.* at 767.

To prevail, a plaintiff must prove: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *E.E.O.C. v. Product*

*Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (citing *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009)).[5]

To determine whether Arguello has plausibly alleged a failure to accommodate claim, I first must identify which requested accommodations she alleges that the defendants denied. When Arguello told Padmore that she was pregnant in November 2023, she told him that because of her high-risk pregnancy and diabetes, she would need to attend medical appointments over her lunch. Doc. 9 ¶ 63. The two appear to have agreed on this accommodation and Padmore said she could remain clocked in when attending medical appointments. *See id.* ¶¶ 63, 76. However, on January 4, 2024, HR told her that she needed to clock out when attending appointments over lunch. *See id.* ¶ 76. Arguello does not allege that she actually began to clock out when attending medical appointments over lunch, only that she received conflicting instructions. *Id.*; *see also* Doc. 13-1 at 8. And she does not allege that she was not allowed to attend medical appointments over lunch. Therefore, she has not alleged that the defendants denied her requests.

On January 18, 2024, Arguello requested that the defendants accommodate her pregnancy complications by providing her parking within one-block of her work. Doc. 9 ¶ 81. Although the defendants initially resisted this request, they provided her a spot seven days after her request. *Id.* ¶ 82. Thus, Arguello does not allege that the defendants denied her requested accommodation, only that they delayed it for a week. "[A]n employer's 'unreasonable' delay may constitute the denial of an accommodation in some circumstances." *Marks v. Washington Wholesale Liquor Co. LLC*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017) (collecting cases analyzing whether delay in granting accommodation was reasonable). "But '[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim.'" *Smith v. CSRA*, 12

[5] The Eighth Circuit has used various iterations of tests for failure to accommodate claims. *See Tomshack v. Wilkie*, 584 F. Supp. 3d 740, 754–57 (D.S.D. 2022) (collecting cases).

F.4th 396, 415 (4th Cir. 2021) (quoting *Marks*, 253 F. Supp. 3d at 324) (alterations in original).

Arguello argues that the defendants "initially refused to provide Arguello with a reasonable accommodation when [they] required her to pay for her parking." Doc. 18-1 at 6. But, as she acknowledges, that was not the final accommodation she received after she advocated for herself. *Id.* She argues that "[t]his is not the standard for the interactive process." *Id.* But failing to engage in the interactive process "does not itself give rise to liability under the ADA." *Ehlers*, 34 F.4th at 660 (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999)). Because the defendants granted her request for a parking accommodation within a week, she has not alleged that they denied her accommodation. Therefore, Arguello has failed to state a plausible failure to accommodate claim under the ADA.

#### ***iii. Interference Claim***

A plaintiff alleging an ADA interference claim "must show that 1) the charging party engaged in activity statutorily protected by the ADA; 2) the charging party engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; 3) the defendants interfered on account of the charging party's protected activity; and 4) the defendants were motivated by an intent to discriminate." *Equal Emp. Opportunity Comm'n v. CRST Int'l, Inc.*, 351 F. Supp. 3d 1163, 1181 (N.D. Iowa 2018) (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017)).

The parties primarily contest whether Arguello pleaded that the defendants interfered with her protected activity and whether the City's responses to her invocation of rights under the ADA were motivated by an intent to discriminate. Doc. 13-1 at 8–9; Doc. 18-1 at 6; Doc. 20 at 3. In her amended complaint, Arguello alleges that "on January 25, 2024, Bertrand and Padmore expressed frustration and attempted to intimidate Arguello because she exercised her rights under the ADA." Doc. 9 ¶ 152. Without more, this is a conclusory allegation that is not supported by any specific factual

contentions. Arguello does not allege with any specificity what Bertrand and Padmore actually did to intimidate her because she had exercised her rights. Thus, she has failed to plausibly allege an ADA interference claim. Count II must be dismissed in its entirety.

### *b. Count I – Pregnancy Discrimination Under the PWFA*

Arguello argues three pregnancy discrimination claims under the PWFA: (1) the City discriminated against her by placing her on administrative leave and terminating her employment, (2) the City failed to provide her reasonable accommodations and (3) the City interfered with her ability to exercise her rights under the PWFA. Doc. 9 ¶¶ 141–45. She incorporates the same factual basis as that underlying her disability discrimination claim. *See* Doc. 9.

Arguello claims that her "pregnancy and decision to request accommodations due to her pregnancy were factors in the City's decision to place Arguello on administrative leave and ultimately terminate her employment." Doc. 9 ¶ 145. The PWFA prohibits an employer from taking "adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation to the known limitations related to the pregnancy, childbirth, or related medical conditions of the employee." 42 U.S.C. § 2000gg-1(5). Arguello merely paraphrases the statutory language without providing any factual allegations to support her claim. Therefore, I find that she has failed to state a plausible claim and this aspect of her claim is dismissed.

Next, Arguello argues that the City resisted giving her accommodations related to attending medical appointments and a parking space. Doc. 9 ¶ 142. The PWFA mandates that employers "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. 42

U.S.C. § 2000gg-1(1). The section of the ADA addressing failure to accommodate utilizes nearly the same language.[6]

Where the language of the PWFA mirrors the language of the ADA, it is appropriate to use the legal standards of the ADA. *See U.S. Equal Emp. Opportunity Comm'n v. Sec. Assurance Mgmt., Inc.*, No. CV 25-00181, 2025 WL 2911781, at *4 n.4 (D.D.C. Oct. 14, 2025) ("Where the language of the PWFA mirrors that of the ADA or Title VII, the Court applies the legal standards governing ADA and Title VII claims to Plaintiff's corresponding PWFA claims, as the PWFA, ADA, and Title VII all share the same purpose: eliminating workplace discrimination."). The parties have also applied the ADA to the PWFA. *See* Doc. 13-1 at 8–9; Doc. 18-1 at 5–7. In this case, the alleged facts for the failure to accommodate claims under the ADA and PWFA share the same alleged factual basis. They also fail for the same reason – Arguello has failed to allege that the defendants denied an accommodation request.

Arguello also brings a claim for interference with her rights under the PWFA. Doc. 9 at 21 ¶ 144. The PWFA makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 2000gg-2. This again mirrors the language in the ADA and the parties have applied the ADA law.[7] Doc. 13-1 at 8–9; Doc. 18-1 at 5–7. Likewise, Arguello relies on the same allegations pleaded in support of her ADA interference claim. This means her PWFA interference claim fails, as she did not allege

[6] *See* 42 U.S.C. § 12112 (It is unlawful to not provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.")

[7] 42 U.S.C. § 12203(b) ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.").

specific facts as to how Padmore and Bertrand attempted to intimate her. As with Count II, Count I must be dismissed in its entirety.

### *2. Counts III, IV, VIII and IX – Race and Sex Discrimination*

Arguello brings race and sex discrimination claims under Title VII and 42 U.S.C. § 1981. Doc. 9. "Title VII and Section 1981 claims are analyzed under the same framework." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n.2 (8th Cir. 2010). To establish a prima facie case of discrimination, a plaintiff must make a minimal evidentiary showing that he or she (1) is a member of a protected class, (2) was qualified for the position or met his or her employer's legitimate expectations, (3) suffered an adverse employment action and (4) that the circumstances of his or her employment, or adverse employment action, give rise to an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016); *Young*, 754 F.3d at 577; *see also Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093, 1096 (8th Cir. 2018) (establishing a prima facie case requires a minimal evidentiary showing). Establishing a prima facie case creates a presumption that the employer discriminated against the plaintiff. *Banks*, 829 F.3d at 666.

"A plaintiff can create an inference of discrimination by showing that she was treated differently than similarly situated persons who are not members of the protected class." *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023). "Comparator employees must be similarly situated in all relevant respects." *Ingram*, 91 F.4th at 928 (quoting *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 435 (8th Cir. 2016)) (internal quotations omitted). "The comparators 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (quoting *Burton v. Ark. Sec'y of State,* 737 F.3d 1219, 1229 (8th Cir.2013)). "The comparators need not have committed the exact same offense but must have engaged in conduct 'of comparable seriousness.'" *Ebersole*, 758 F.3d at 925 (quoting *Burton,* 737 F.3d at 1231).

Arguello's amended complaint alleges that the defendants discriminated against her based on her race and sex, leading to adverse employment outcomes (placement on leave and discharge). Doc. 9 ¶¶ 166, 172, 195, 202. In Counts VIII and IX, Arguello also claims that the City and Padmore discriminated against her "in the terms and conditions of her employment contract, including by subjecting her to discriminatory terms of employment, denying her equal resources and support[] and publicly undermining her professional competence. *Id.* ¶¶ 195, 202. Of course, I am not bound by these legal conclusions unless they are supported by specific factual allegations in the amended complaint. *See Ashcroft*, 556 U.S. at 678.

### *a. Counts III, VIII and IX – Race Discrimination*

Arguello contends that her "race played a part in the decision to place Arguello on leave, and, ultimately, terminate her employment." *Id.* ¶ 166. She asserts that non-Black employees were treated more favorably, including not being "placed on leave or terminated despite substantiated findings of performance deficiencies," "were not forced to remain at their home while on administrative leave" and "were not placed on leave during investigations into their conduct." *Id.* ¶ 164. Again, this is merely legal language couched as a factual allegation.

Mackey, who is Native American, is the only comparator employee whose race Arguello has identified.[8] While an outside attorney investigated Mackey, she "remained in her role without being placed on leave, having her job duties restricted, or being assigned to home confinement." *Id.* ¶ 48. Ultimately, the outside attorney concluded that "Mackey had displayed hostility toward Arguello, spoke negatively about Arguello in public settings, paid her niece to spy on Arguello, and failed to engage in meaningful

[8] Arguello has not identified the race of other employees who underwent investigation. *See* Doc. 9 ¶¶ 19, 25.

efforts to collaborate with Arguello." *Id.* ¶ 53. However, Mackey (who reported to the HRC) was not disciplined by the City Council or the HRC. *Id.* ¶¶ 8, 54.

In contrast, the internal investigative summary into Arguello found that she had violated City policies, administrative work rules and Iowa law, concluding that she had "exceeded her authority by assisting individuals with filing out-of-state civil rights complaints, misrepresented herself as acting on behalf of the City, and failed to obtain supervisory approval for certain professional actions." *Id.* ¶ 128. While Arguello's sanctions – being placed on leave and discharged – were undoubtedly more serious than those Mackey faced, the alleged misconduct differs.

In addition, Arguello and Mackey had different job titles and roles, and Mackey was supervised by the HRC while Arguello was supervised by Padmore. Based on all of these differences, Arguello has failed to allege that Mackey is a proper comparator employee. Arguello's assertions are insufficient, even at the motion to dismiss stage, to allow me to draw the reasonable inference that she was discriminated against based on her race. Therefore, Counts III, VIII and IX must be dismissed in their entirety.

### *b. Count IV - Sex Discrimination*

Arguello alleges that her "sex was a motivating factor in the City's decision to place Arguello on administrative leave, force her to remain home while on leave, impose restrictive conditions that barred her from performing her work duties during her pregnancy, and, ultimately, terminate her employment." Doc. 9 ¶ 172. Without factual development, she contends, "Male employees were not treated similarly." *Id.*

Arguello attempts to use Padmore, and two unnamed male employees as comparators. In 2022, an outside attorney investigated whether Padmore and another male employee had treated women poorly in the workplace. *Id.* ¶ 19. During the investigation, they were not placed on administrative leave, did not have to work from home and did not lose their job duties. *Id.* Arguello does not identify the outcome of the investigation. *Id.*

As with Mackey, Arguello has failed to plead sufficient facts to plausibly allege that Padmore and the two unnamed male employees are proper comparators. They did not have the same roles or supervisors. Nor has Arguello alleged with any specificity what these male employees were accused of, or the outcome of the investigation. Thus, her allegations do not rise to the level of showing that the alleged misconduct by the male employees was similar to, or as serious as, her own alleged misconduct.

Nor is the male employee who allegedly called Arguello "hot," and touched his penis, a proper comparator. Arguello does not allege any specific information about who supervised the employee or the outcome of the investigation. *Id.* ¶ 25. For all of these reasons, Arguello has failed to plausibly allege that she was discriminated against based on her sex. Count IV must be dismissed.

### *B. Count VI – Hostile Work Environment*

Arguello claims that the defendants created a hostile work environment based on her sex and pregnancy, violating her rights under Title VII. Doc. 18-1 at 7–9. A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Eliserio v. United Steelworkers of Am. Loc. 310*, 398 F.3d 1071, 1076 (8th Cir. 2005) (internal quotations omitted). The Eighth Circuit has stated:

> To establish a prima facie case for hostile work environment, a plaintiff must show: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action.

*Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021).

"[T]he elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." *Id.* (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th

Cir. 2016)). Whether "the harassment affected a term, condition, or privilege of employment—involves 'both objective and subjective components.'" *Warmington*, 998 F.3d at 799 (quoting *Blomker*, 831 F.3d at 1056). "At the pleading phase, the court must determine whether the alleged harassment is 'severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe her working conditions have been altered.'" *Id.*

Courts examine the totality of the circumstances "[t]o determine whether a complaint alleges an objectively hostile work environment." *Id.* In making this determination, courts "may consider circumstances such as the 'frequency and severity of the discriminatory conduct,' whether the conduct was 'physically threatening or humiliating, as opposed to a mere offensive utterance,' and whether the 'conduct unreasonably interfered with the employee's work performance.'" *Id.* (quoting *Blomker*, 831 F.3d at 1057). "A hostile work environment claim must allege more 'than a few isolated incidents.'" *Id.* "Courts must 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.*

Arguello alleges that "[s]he experienced repeated derogatory comments from colleagues and supervisors, exclusion from meetings and opportunities, threats from City volunteers, and public questioning of her competence and professional contributions." Doc. 9 ¶ 182. However, not all criticism of work is harassment. *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003). A "casual nexus" must also "exist[] between the harassment and the protected group status." *Warmington*, 998 F.3d at 799. Arguello identifies only two alleged incidents with any nexus to her sex or pregnancy over three years.[9] *See* Doc. 18-1 at 7; Doc. 9 ¶ 5. First, Arguello alleges that in 2022, an unidentified male employee told "her she was 'hot' and, at the same time, touched his

[9] It is unclear whether the two incidents in which HR investigated alleged violations of the dress code constituted harassment.

penis." Doc. 9 ¶ 25. Second, Arguello contends that when Padmore discussed her pregnancy, he stated, "Now you'll have another loudmouth in the house." *Id.* ¶ 65.

If the incident with the male employee occurred as Arguello describes, it was deplorable and wildly inappropriate. Similarly, the alleged remark by Padmore, if made in the manner Arguello alleges, was rude and unprofessional. However, two isolated incidents of inappropriate behavior over three years is not sufficient to state a plausible hostile work environment claim because the actions were not sufficiently severe or pervasive. *See Blomker*, 831 F.3d at 1058 (collecting cases in which courts rejected hostile work environment claims based on isolated instances of sexually inappropriate behavior). Count VI must be dismissed.

### *C. Counts XI and XII – Defamation and Interference with Business Relations*

In her amended complaint, filed April 29, 2026, Arguello adds Counts XI and XII. Doc. 9 ¶¶ 210–21. These claims for defamation and interference with business relations arise from comments Padmore allegedly made on February 17, 2024. *Id.* The defendants argue that these claims fail because Arguello first asserted them after the statute of limitations expired. Doc. 13-1 at 18–21.

Iowa law establishes a two-year statute of limitation for "injuries to the person or reputation." Iowa Code § 614.1(2). Iowa courts "look beyond the label placed on the claim by the parties and instead focus on 'the actual nature of the action' to determine the applicable limitations period." *Hallett Const. Co. v. Meister*, 713 N.W.2d 225, 230 (Iowa 2006) (quoting *Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.*, 507 N.W.2d 405, 411 (Iowa 1993)). "When [the Iowa Supreme Court] has been called upon to pinpoint 'the actual nature of the action' it has looked to what harm the plaintiff has alleged in the suit." *Tracy v. Peter M. Soble, P.C.*, 2011 WL 944420, at *3 (Iowa Ct. App. Mar. 11, 2011). Arguello alleges that Padmore's comments interfered with her business relationships by harming her reputation. Doc. 9 ¶¶ 219–21. Because both claims relate to reputational injuries, they are subject to a two-year statute of limitations.

Therefore, the claims are barred by the statute of limitations unless they relate back to the original complaint.

Arguello argues that the new claims relate back because "[i]n her original Complaint, filed before February 17, 2026, [she] asserted the facts that form the basis of her defamation and interference with business relations claims." Doc. 18-1 at 10 (citing Doc. 1 ¶¶ 93–97). The defendants contend that the claims do not relate back because although the original complaint included the facts central to the new claims, it did not provide them with notice of "non-employment claims arising out of the Complaint's background factual allegations." Doc. 20 at 5.

Under the Federal Rules of Civil Procedure, an amended pleading relates back to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed R. Civ. P. 15(c). At issue is whether the claims Arguello added in the amended complaint "arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P 15(c)(1)(B).

"To arise out of the same conduct, transaction, or occurrence, the claims must be tied to a common core of operative facts." *Dodd v. United States*, 614 F.3d 512, 515

(8th Cir. 2010) (internal quotations and citations omitted). "An amended motion may raise new legal theories only if the new claims relate back to the original motion by 'aris[ing] out of the same set of facts as [the] original claims.'" *Id.* (quoting *Mandacina v. United States*, 328 F.3d 995, 1000 (8th Cir. 2003)) (alterations in original). "The facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim." *Id.*

Arguello's original complaint alleged that Padmore's statements on February 17, 2024, "affected Arguello's professional reputation and ability to get clients." Doc. 1 at 15 ¶ 96. While paltry and threadbare, this allegation provided sufficient notice for the later-added new claims. Because the new claims are not barred by the statute of limitations, I will address each individually.

#### *1. Count XI – Defamation*

Arguello's defamation claim against the City and Padmore is based on Padmore's statements at a February 17, 2024, publicly live-streamed budget meeting. Doc. 9 ¶¶ 210–15. Arguello alleges that Padmore stated that she "was a 'poor consultant' regarding diversity, equity, and inclusion" and represented that "Arguello was resistant to updating the [EEOC] plan." *Id.* ¶ 211. Arguello alleges that Padmore had previously given her positive performance evaluations and had told her that the City Council was resistant to updating the plan. *Id.* ¶¶ 211–12. Because of these inconsistencies, she argues Padmore's statements at the meeting were false. *Id.*

The defendants contend that Arguello's defamation claim fails because "[t]he alleged statements are nonactionable opinions, incapable of being reasonably interpreted as stating facts." Doc. 13-1 at 18. Arguello argues that because Padmore spoke as Arguello's supervisor, and presumably knew about her performance, "[w]hether a reasonable listener would interpret these statements as an opinion and not a factual observation of Arguello cannot be resolved at this point in the litigation." Doc. 18-1 at 11. The defendants assert that "Padmore's role as [Arguello's] supervisor cannot

transform indefinite assessments with no precise, objectively verifiable meaning into facts." Doc. 20 at 6. Thus, his statements about her "consulting ability and workplace performance are nonactionable opinions and evaluative workplace judgments, not verifiable statements of fact." *Id.*

"To establish a prima facie case in any defamat[ion] action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 489 (Iowa 2021) (quoting *Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013)) (alteration in original). "One limit on a defamation claim is that '[o]pinion is absolutely protected under the First Amendment.'" *Andrew*, 960 N.W.2d at 489 (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 177 (Iowa 2004), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016)) (alterations in original). The Iowa Supreme Court has recognized that opinions may often imply an assertion of fact such that they would not be entitled to protection:

> the framework of analysis is no longer whether the alleged defamatory statement is fact or opinion. Rather the framework of analysis now is whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false. Under this analysis, "statements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false." *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). The statement that the plaintiff must prove false is not the literal wording of the statement but what a reasonable reader or listener would have understood the author to have said.

*Yates v. Iowa West Racing Ass'n*, 721 N.W.2d 762, 770–71 (Iowa 2006) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16–17 (1990)). The Iowa Supreme Court has adopted the following four-factor test to determine whether a statement is an opinion: (1) whether the "statement 'has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous'"; (2) the degree to which the statement is "objectively capable of proof or disproof"; (3) "the context in

which the" statement occurs; and (4) "the broader social context into which" the statement fits. *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018) (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)).

Under this test, whether Arguello was a poor consultant is a matter of opinion. In *Yates*, the Iowa Supreme Court determined that the statement "substandard and poor performers" constituted an opinion. 721 N.W.2d at 773. In reaching this conclusion, the court applied the first two factors and noted that the phrase "substandard and poor performers" lacked "a precise and verifiable meaning and [was] therefore less likely to give rise to clear factual implications." *Id.* The question of whether Arguello was a poor consultant lacks a precise core of meaning, rendering this subjective judgment incapable of proof or disproof. The third and fourth factors involve the context in which the statement occurred – both its narrow context within the discussion and broader social context. *Andrew*, 960 N.W.2d at 493. As pleaded by Arguello, these factors add nothing to suggest that Padmore's statements were anything other than his opinion about whether Arguello was a poor consultant. Thus, this statement cannot form the basis of a defamation claim.

The second statement was that "Arguello was resistant to updating the [EEOC] plan." Doc. 9 ¶ 211. This statement necessarily describes actions that Arguello had undertaken and is not a mere opinion about Arguello's job performance (like "poor performer"). While somewhat vague, I find that the statement that Arguello resisted implementing the EEOC plan has a meaning that could be proven on verifiable facts, such as statements or actions on her part. Thus, the second statement is not a protected opinion. At this stage of the case, Arguello has pleaded a plausible defamation claim based on Padmore's alleged statement that she had resisted updating the EEOC plan. That aspect of Count XI will proceed.

### *2. Count XII – Tortious Interference*

Arguello alleges that Padmore's statements at the budget meeting[10] interfered with existing and prospective business relations related to her DEI consulting business. Doc. 9 ¶¶ 218–19. For the reasons discussed with regard to Count XI, only Padmore's statement that she resisted updating the EEOC plan can be considered because his statement that she was a poor consultant is an opinion protected by the First Amendment. Activity protected by the First Amendment cannot serve as the basis for a tortious interference claim. *See, e.g.*, *Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (Because the appellee's statements were an opinion, "[a]ppellants cannot state a claim for intentional interference with economic relations and prospective economic advantage because protected speech cannot be the basis for such a claim."); *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 857 (10th Cir. 1999) (collecting cases in which federal courts have rejected "a variety of [business] tort claims based on speech protected by the First Amendment"). As such, Count XII cannot be based on the "poor consultant" statement.

As for Padmore's second statement, the elements of tortious interference with contract under Iowa law are:

> (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001) (quoting *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 377 (Iowa 1997)). "Iowa courts apply the Restatement (Second) of Torts in analyzing intentional interference claims." *CRST Expedited, Inc. v. TransAm Trucking, Inc.*, 960 F.3d 499, 504 (8th Cir. 2020) (citing

---

[10] She also alleges that his "other communications" also had this effect. Doc. 9 ¶ 219. It is unclear what she includes as "other communications."

*Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008)). In addition to interference with established contractual relationships, Iowa law "recognize[s], as a tort, interference with prospective contractual relationships." *Iowa Coal Min. Co. v. Monroe Cnty.*, 555 N.W.2d 418, 437 (Iowa 1996).

"Proof of intentional interference with a prospective contract or business relationship essentially calls for evidence on the same elements relative to *future* business." *Burke v. Hawkeye Nat. Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991) (emphasis in original). The elements of intentional interference with prospective contracts or business relations are: (1) "[a] prospective contractual or business relationship," (2) "the defendant knew of the prospective relationship," (3) "the defendant intentionally and improperly interfered with the relationship," (4) "the defendant's interference caused the relationship to fail to materialize" and (5) damages resulted. *Blumenthal Inv. Trs. v. City of W. Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001).

Padmore argues that it "is *implausible* on its face that anything Padmore said at a City Council meeting would have any impact on [Arguello's] private consulting business." Doc. 20 at 6 (emphasis in original). Based on the scant allegations in the amended complaint, I agree. "A claim is facially plausible 'where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 371 (8th Cir. 2017) (quoting *Blomker*, 831 F.3d at 1055). In light of Arguello's limited factual allegations, it is implausible that Padmore's isolated comment that she "was resistant to updating the [EEOC] plan" could have "interfered with Arguello's existing and prospective business relationships." Doc. 9 ¶¶ 211, 219. As such, Count XII must be dismissed.

### *D. Leave to Amend*

Arguello seeks leave to amend Count IX to bring it under 42 U.S.C. § 1983. Doc. 18-1 at 10. Because I have found dismissal to be necessary on another basis, and Arguello has not explained how any potential amendment might cure that deficiency, there is no reasons to permit an amendment. *See, e.g., Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002) ("[T]he district court was not required to engage in a guessing game" when the plaintiffs did not explain how they "would amend the complaint to save the claim.").

## *V. CONCLUSION*

For the reasons set forth herein, defendants' motion (Doc. 13) to dismiss is **granted in part and denied in part**, as follows:

1. The motion is **granted** as to Counts I, II, III, IV, VI, VIII, IX, X and XII, which are hereby **dismissed** in their entirety. The motion is also **granted** as to the "poor consultant" statement alleged in Count XI. That basis for defamation liability is **dismissed**.

3. The motion is **denied** as to the "resistant to updating the [EEOC] plan" statement alleged in Count XI. Count XI will proceed as to that statement only.

4. As a result of this order, the only claims of the amended complaint (Doc. 9) that will proceed are Counts V and VII, along with the "resistant to updating the [EEOC] plan" statement alleged in Count XI.

**IT IS SO ORDERED** this 9th day of October, 2026.

______________________________
Leonard T. Strand
United States District Judge